# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>STEVEN BRADFORD,<br><br>      Defendant. | Case No. CR06-0012<br><br>REPORT AND RECOMMENDATION |

_____

This matter comes before the court pursuant to defendant's April 4, 2006 motion for specific performance of plea agreement and motion to dismiss (docket number 10). The government filed its resistance to the defendant's motion on April 20, 2006 (docket number 23). This matter was referred to the undersigned United States Magistrate Judge for the issuance of a report and recommendation. The court held an evidentiary hearing on defendant's motion on April 28, 2006, at which the defendant was present and represented by attorney Webb Wassmer. The government was represented by Assistant United States Attorney C.J. Williams. It is recommended that defendant's motion for specific performance of the plea agreement be granted.

### Procedural History

On September 28, 2006, the defendant was indicted on two counts of distributing heroin (CR05-85; docket number 1). On November 2, 2005, he was charged in a three-count superseding indictment with one count of conspiracy to distribute heroin (count 1) and two counts of distributing heroin (counts 2 and 3) (CR05-85; docket number 19). On December 12, 2005, the defendant pleaded guilty to count 1 of the superseding indictment pursuant to a plea agreement. Paragraph three of the plea agreement, signed by all parties

1

on December 12, 2005, provides that the "United States Attorney's Office . . . will file no additional Title 21 drug-related criminal charges based upon or arising from information now in our possession." The clause "or arising from" was added by the defendant in plea negotiations. Paragraph three of the plea agreement further provides that "[i]f this office becomes aware of evidence of additional crimes warranting criminal prosecution, all information in our possession could be used in such a prosecution."

On February 9, 2006, the defendant was charged in a one-count indictment in case number CR06-12 (the instant case) with "knowingly and intentionally distributing a mixture or substance containing a detectible amount of heroin, a Schedule I Controlled Substance, to J.H. [on June 10, 2004], resulting in the death of J.H. from use of the controlled substance."

**Factual Background**

J.H. died of a heroin overdose on June 11, 2004, following an evening of injecting heroin with Rachel Hoskins and James Callanan. J.H. was in Callanan's apartment at the time of his death. Hoskins and Callanan were transported separately to the police station and interviewed as potential witnesses regarding the circumstances involving J.H.'s death. In her statement of September 11, 2004, Hoskins stated that "[w]e drove to 17th Street SE and parked near 6th or 7th Avenue. [J.H.] got out and walked about a half block down 17th Street towards 8th Avenue. He was on the right side of the street as you face 8th Avenue. I couldn't see what house he went to." Callanan's statement said that "[w]e went to 5th Ave. And 15th St. SE and [J.H.] got out of the car and started walking down 15th St. with this guy. All I know is that he was a black guy in his mid 20's. They turned town the alley walking towards 14th St. And I lost sight of them." Also on September 11, 2004, Callahan provided the names of thirteen people who sell heroin in the Cedar Rapids area, including "B - possibly named Steven, black male, PBX# 521-0581."

2

In July of 2004, investigators obtained the billing and subscriber information, i.e., account name and address, for PBX #521-0581. The subscriber was identified as Tiffany Jones.

In about October of 2005, local, state and federal law enforcement authorities formed an ad hoc task force to investigate several heroin-related deaths in the Cedar Rapids area. The police and medical records of 24 local heroin overdose deaths were analyzed and the task force focused on those cases having the highest likelihood of proving the source of the drugs and cause of death.

On November 2, 2005, DEA Special Agent Jarad Harper testified before the grand jury wherein he referred to the defendant as "B." At the hearing, Harper testified that there are at least four individuals involved in heroin distribution in the Cedar Rapids area that go by the street name "B."

Callanan was interviewed again on November 21, 2005 by Iowa DCI Special Agent Wade Kisner. According to Kisner's report, Callanan was interviewed to "obtain background information regarding the death of [J.H.], which occurred as a result of a heroin overdose on June 11, 2004. According to reports, Callanan was using heroin with [J.H.] on the evening prior to his death." Kisner's report further provides:

> CALLANAN stated that he, HOSKINS, and HEIMS had driven up Fifth Avenue SE and he had parked the car on the right side of Fifth Avenue SE just past Fourteenth Street SE. CALLANAN stated that he did not personally purchase heroin that night or go with [J.H.], but waited in the car with HOSKINS as [J.H.] walked down the street to a residence close by. It should be noted that CALLANAN drew a map trying to describe the location where he had stopped and where [J.H.] had gone and purchased a fifty dollar ($50) bag of heroin that evening. CALLANAN states that he residence would be on Fifth Avenue SE between Twelfth Street SE and Fourteen Street SE.
>
> CALLANAN stated that he was familiar with two people, within a block and a half radius of where they had stopped that

3

> night, that sold heroin. CALLANAN stated that although he did not go with [J.H.] to purchase the heroin, he feels strongly that [J.H.] was dealing with the same people that he(CALLANAN) had dealt with in the past.
>
> CALLANAN identified the following subjects as having a connection to a residence in that general location of Fifth Avenue SE . . . A black male named B. He states that B was popped and taken in at the time that POPS was arrested.

POPS is the street name for David Pelham, who was the confidential informant that arranged for the controlled buys from the defendant, which led to the CR05-85 prosecution.

On December 16, 2005 Kisner interviewed Rachel Hoskins. According to Kisner's report, Hoskins was re-interviewed because she was present when [J.H.] purchased the heroin that led to his death. Kisner testified at the hearing that Hoskins was not interviewed prior to December 16, 2005 because the investigators wanted to re-interview Callanan first and because the demands on their time and resources did not allow for the interview to take place earlier. Regarding J.H.'s purchase of heroin on the night in question, Kisner's report provides:

> HOSKINS states that they had been trying to call a heroin dealer who she identified as B. HOSKINS identified B as a black male from Chicago, Illinois, and she indicated that she (HOSKINS) had purchased heroin from this B subject 150 times.
>
> HOSKINS states that B lived on the southeast side of Cedar Rapids, Iowa, and was a black make, 25-26 years of age.
>
> HOSKINS stated that [J.H.] called B with his (J.H's) cell phone with a telephone number which had been provided to [J.H.] by her and JAMES.
>
> HOSKINS states that [J.H.] did leave the vehicle and walked to the corner from where they were parked, and that even though she was parked behind a van, she was able to lean over

4

> and see [J.H.] meeting with a black male subject who she identified as B. HOSKINS stated that there was no doubt in her mind that JUSTIN was meeting with B and did obtain heroin from B that evening. HOSKINS stated that B is a black male with light skin having dark spots or blotches and that he is very tall and skinny. HOSKINS states that she and JAMES provided the telephone number for B to [J.H.] prior to the meeting, and so there was no doubt in her mind that she witnessed the heroin being exchanged or sold by B to [J.H.].

As part of this interview, Hoskins was asked to examine a photograph of Larry Wrice. Hoskins stated that Wrice was not the person she knew as B.

On December 19, 2005, the task force investigating J.H.'s death sent an administrative subpoena to the phone company to obtain J.H.'s cellular telephone records. The requested information was received on December 20, 2005. The records revealed no match between numbers called on J.H.'s cellular telephone and anyone known by the street name of "B." Thus, the investigators saw a need to do another interview with Hoskins to clarify this information, i.e., to determine if someone else's cellular telephone was used on June 10, 2004 to contact "B," and to attempt to have her identify the person known as "B."

On January 5, 2006, Hoskins was shown a photo lineup, from which she identified the defendant as the "B" from whom J.H. had purchased heroin on the night of his death. According to Harper's testimony at the hearing, this was the first time that law enforcement was 100% sure that the person identified as "B," who sold the heroin to J.H. on the night in question, was the defendant. Hoskins also told investigators it was possible that J.H. used her cell phone to call "B" on June 10, 2004 and arrange the heroin purchase.

On February 1, 2006, an administrative subpoena was issued for Hoskins' cell phone records. The requested information was received by the investigators within a day or two. The records revealed phone traffic between the defendant and Hoskins' phone on the night of June 10, 2004, which was consistent with Hoskins' prior statements regarding

5

J.H.'s efforts to set up the buy. As a result of the task force's investigation, the defendant was indicted on February 9, 2006 for the distribution of heroin to J.H. resulting in his death.

## Legal Analysis

The defendant raises three issues in his brief. First, the defendant argues that the information in the possession of the ad hoc task force should be deemed to be in the possession of the United States Attorney's Office. The government concedes that all of the information in the possession of the ad hoc task force is constructively in the possession of the United States Attorney's Office.

Second, the defendant argues in his brief that date on which the "information now in the [the government's] possession" should be evaluated is December 28, 2005, which is the date that the district court adopted the undersigned's report and recommendation to accept the defendant's plea agreement and guilty pleas. The government contends that the applicable date for determining what information was "in [its] possession" was December 12, 2006, the date all parties signed the plea agreement. At the hearing, defendant's counsel cited to United States v. Norris, 439 F.3d 916 (8th Cir. 2006) and conceded that Norris lends support to the government's argument that the parties to a plea agreement become bound to its terms as of the date of its signing. "[The] general rule [that a plea agreement is generally not enforceable until the district court signs it] is meant to address instances where the court finds the plea bargain unacceptable." Norris, 439 F.3d at 919 (citing United States v. Walker, 927 F.2d 389, 390 (8th Cir. 1991)).

On December 12, 2005 the undersigned recommended that defendant's plea agreement be accepted, and the district court accepted the report and recommendation on December 28, 2005. The defendant did not move to withdraw his guilty plea while the report and recommendation was pending. The government was bound to the promises it made in the plea agreement as of December 12, 2005, the date it was signed. Under these

6

circumstances, the court agrees with the parties that December 12, 2005 is the applicable date for determining what information was in the government's possession.

Finally, the defendant argues that the government breached the plea agreement because the indictment pending in this case is "based upon" and arose from information in the government's possession as of December 12, 2005. The government contends that it did not breach the plea agreement because it had no evidence that the defendant committed an additional crime until December 16, 2005, four days after the parties entered into the plea agreement and the defendant pleaded guilty. Rather, the government argues that the indictment in this case was based on and arose out of information received after the parties executed the plea agreement.

Plea agreements are contracts between the defendant and the government. United States v. Andis, 333 F.3d 886, 890 (8th Cir. 2003); Margalli-Olvera v. INS, 43 F.3d 345, 351 (8th Cir. 1994). "Generally, plea agreements are to be construed as contractual in nature, and contract principles should be applied in interpreting them." Norris, 439 U.S. at 919 (citing United States v. DeWitt, 366 F.3d 667, 669 (8th Cir. 2004)); United States v. Van Thournout, 100 F.3d 590, 594 (8th Cir. 1996). However, the application of general contract principles is "tempered by the constitutional implications of a plea agreement." Andis, 333 F.3d at 890 (quoting Margalli-Olvera, 43 F.3d at 351). "[U]nder the doctrine set forth in Santobello v. New York, 404 U.S. 257, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971), there is a due process right to enforce an agreement with the prosecution if the defendant honors the terms of that agreement." Norris, 439 F.3d at 919. "Allowing the government to breach a promise that induced a guilty plea violates due process." Margalli-Olvera, 43 F.3d at 351 (citing Mabry v. Johnson, 467 U.S. 504, 509 (1984) and Santobello, 404 U.S. 257). Also to be considered is the "public confidence in the fair administration of justice, and the effective administration of justice in a federal scheme of government." Van Thournout, 100 F.3d at 594 (quoting United States v. Harvey, 791 F.2d 294, 300 (4th Cir. 1986)).

There are two remedies for the government's breach of a plea agreement: remand for specific performance or withdrawal of the guilty plea. Id. The decision as to the appropriate remedy rests in the sound discretion of the court, although specific performance is the preferred remedy. Id. "In determining whether to grant specific performance, the court should (1) the possible prejudice to the defendant, (2) the conduct of the government, and (3) the public interest." Margalli-Olvera, 43 F.3d at 355 (citing United States v. Walker, 927 F.2d 389, 391 (8th Cir. 1991)). Prejudice to the defendant is the most important factor. Id. (citing United States v. McGovern, 822 F.2d 739, 746 (8th Cir.), cert. denied, 484 U.S. 956 (1987)) "If the defendant's detrimental reliance has been great, the government must be held to its promises." Id. (citing Walker, 927 F.2d at 391).

The defendant argues that the government breached the plea agreement by indicting him in case number CR06-12 on February 9, 2006, alleging that he "did knowingly and intentionally distribute a mixture or substance containing a detectible amount of heroin, a Schedule I Controlled Substance, to J.H., resulting in the death of J.H. from use of the controlled substance." According to the defendant, the instant prosecution is "based upon" and "arises from" information in the possession of the government on December 12, 2005.

The government resists, arguing that prior to Hoskins' interview on December 16, 2005, the only conceivable connection between J.H.'s death and the defendant was that the defendant may have been one of eight heroin dealers somehow connected to a house within a two-block radius of where J.H. purchased the fatal dose of heroin on June 10, 2004. According to the government, the terms "based upon" and "arising from" connote the primary foundation for a criminal charge and, as of December 12, 2005, the government had no grounds for charging the defendant with distributing heroin to J.H. resulting in his death. It was not until December 16, 2005 that there began to be evidence upon which to base a criminal charge relating to the death of J.H. The government argues that the instant indictment was "based upon" and "arose from" Hoskins' statement on December 16,

2005, and the subsequent corroboration of this statement, and not the information possessed by the government four days earlier.

Had the plea agreement contained only the "based upon" language, the court would likely agree with the government's interpretation of the plea agreement. As of December 12, 2005, the government lacked sufficient evidence upon which to "base" an indictment. The "arises from" language, however, is much broader and supports the defendant's arguments. Although this term was drafted by the defendant, it was agreed to by the government, and now the government must adhere to the literal terms of the plea agreement. See United States v. Transfiguracion, 442 F.3d 1222, 1228 (9th Cir. 2006) ("As a defendant's liberty is at stake, the government is ordinarily held to the literal terms of the plea agreement it made, so that '[t]he government gets what it bargains for but nothing more.'") (quoting United States v. Pruitt, 32 F.3d 421, 433 (9th Cir. 1994)) (internal citation omitted).

The government knew that J.H. had died of a heroin overdose on June 11, 2004. From statements provided on that same day, the government knew that Rachel Hoskins was with J.H. at the time of his death and had been involved with J.H.'s purchase of the heroin on the night in question. Hoskins provided investigators a fairly detailed geographical description of the area where J.H. bought the heroin. James Callanan, the other individual with J.H. at the time of his death, told investigators that "B" was a heroin dealer, and described "B" as a black guy in his mid-20s, possibly named Steven, and provided a cellular telephone number for "B," that was ultimately found to be registered in the name of Tiffany Jones. On November 2, 2005, Special Agent Harper testified before the grand jury and identified the defendant as "B." On November 21, 2005, Callanan was re-interviewed, during which he drew a map which narrowed it down to a two-block area from where the heroin in question was purchased. Callanan also told investigators during this interview that "B," a black male, was connected to a residence in that area from where the heroin was purchased, and that "B" was popped and taken in

9

at the same time that David Pelham was arrested. Pelham was a confidential informant who bought heroin from the defendant which led to the indictment in CR05-85.

According to the investigator's records, the December 16, 2005 interview of Hoskins was conducted because Hoskins was with J.H. on the night of his death, a fact known by the government for over a year. At the hearing, Special Agent Kisner testified that, upon speaking with Special Agent Harper following Hoskins' interview, he "got the impression from Special Agent Harper that he had a good - - at least had an idea who that could be, that there were some other people who had come up in the investigation who are using that street name." The government's post-December 12, 2005 investigation was a continuation of an investigation that had been ongoing for some time. The information obtained by the government following the signing of the plea agreement "arose from" the information already in its possession. Under the terms of the plea agreement, the government agreed not to file additional drug-related criminal charges arising from information then in its possession. The instant indictment breaches the plea agreement. See United States v. Smith, 976 F.2d 861, 864-65 (4th Cir. 1992) (finding that the language employed in the immunity agreement was unambiguous and precluded the government from prosecuting Smith "based on (i.e., using)" any information in its possession on the date in question). "If the Government had intended to preclude only prosecutions based on evidence in its possession insofar as it indicated the commission of a crime by Smith, the Government surely could have so provided." Id.

As the defendant invariably relied on the government's promise not to further prosecute him in pleading guilty to Count 1 of the indictment in CR05-85, and the government has never alleged that the defendant breached the plea agreement in any way, the court finds that specific performance is the appropriate remedy in this case. Holding the government to the terms it bargained for in the plea agreement, the court recommends that the instant indictment be dismissed.

## Conclusion

For the reasons discussed above, **IT IS RECOMMENDED**, unless any party files objections[1] to the Report and Recommendation, that defendant's motion for specific performance of plea agreement and motion to dismiss be granted.

May 18, 2006.

JOHN A. JARVEY
Magistrate Judge
UNITED STATES DISTRICT COURT

---

[1] Any party who objects to this report and recommendation must serve and file specific, written objections within ten (10) court days from this date. A party objecting to the report and recommendation must arrange promptly for a transcription of all portions of the record the district court judge will need to rule on the objections.

11